

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00358-CR

_____

LENDON LEE ADAMS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1413691D

---

Before Gabriel, Pittman, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

Appellant Lendon Lee Adams appeals his conviction for murder for which he was sentenced to seventy years' confinement. *See* Tex. Penal Code Ann. § 19.02(c). In two issues, Adams argues that the evidence is insufficient to support his conviction and that the trial court erred by denying his motion to suppress evidence seized without a warrant. Because sufficient circumstantial evidence demonstrates that Adams was the shooter and because the trial court did not err by denying Adams's motion to suppress, we affirm.

### II. Factual Background

### A. Overview

Twenty-nine-year-old Jonathan Luevano was found shot to death in his tanker truck at a QuikTrip on Bryant Irvin Road in the early morning hours of May 7, 2015. There were no witnesses to the shooting. The QuikTrip security cameras captured a white Ford Mustang with a racing stripe on the passenger side and a spoiler driving past the front of the store immediately prior to the sound of gunshots. Throughout that day, Adams had multiple interactions with law enforcement in Benbrook, Palo Pinto County, and Fort Worth while he was driving a white Ford Mustang with a racing stripe on the passenger side and a spoiler. Based on Adams's interactions with the police, surveillance video from the QuikTrip, ballistics testing, and gunshot residue (GSR) testing, Adams was linked to Luevano's death. Because Adams

challenges the sufficiency of the evidence, we set forth a detailed summary of the evidence presented at trial.

## B. The Murder

Troy Schiell, a driver for Groendyke Transport, Inc. who delivered fuel to various stores around the Metroplex, shared a tanker truck with Luevano; Schiell drove the tanker truck from 4:00 a.m. to 4:00 p.m., and Luevano drove it from 4:00 p.m. to 4:00 a.m. Schiell testified that when he arrived around 3:45 a.m. at the Groendyke yard in Blue Mound on May 7, 2015, Luevano was not there. After Schiell texted Luevano several times and did not hear back from him, Schiell contacted the dispatcher at Groendyke and asked her to check the tanker truck's GPS, which reflected that Luevano had been at the QuikTrip on Bryant Irvin Road for over two hours.[1] The Groendyke dispatcher then called the QuikTrip, and the store clerk confirmed that the tanker truck was still there. Schiell and another driver decided to drive to the QuikTrip to check on Luevano, but while en route, they learned that he was dead.

Trevor Caraway, an assistant manager at QuikTrip, testified that he worked alone at the QuikTrip on Bryant Irvin Road from 10:00 p.m. on May 6 to 7:00 a.m. on May 7. Caraway testified that a tanker trunk arrived to unload gas around 1:30 a.m.

---

[1]Schiell testified that it normally takes about twenty-five to thirty minutes to offload the 9,000 gallons of fuel from the tanker truck and to input the data inside the store.

3

Caraway did not talk to the driver when he came into the store to log in the fuel load on the computer.

During the trial, the State played the video from the QuikTrip's surveillance cameras[2] showing that not long after the driver left to go back to his tanker truck, a customer wearing a gray shirt came into the store and attempted to buy beer. Caraway testified that he told the customer—who was ultimately identified as Adams—that he could not sell beer because it was after midnight. The video shows that Adams exited the store after Caraway denied the purchase. The video then shows a car exit and circle back around next to the pumps and reflects that it has its tail lights illuminated. The video also includes a rapid succession of bangs or loud noises followed by the sound of the car accelerating. The video capturing the activity on the interior of the store shows that immediately after Adams exited, Caraway went to the back of the store to refill the cappuccino machines. Caraway testified that he never heard the bangs or loud noises that occurred outside the store because of all the noise from the fans in the coolers and other machines that were running inside the store.

---

[2]The parties stipulated that State's Exhibit 38 contains two camera angles that were placed side by side "to allow viewing of both camera angles so it would not be required to play one view from start to end and then to have to load the second view and play it in the same manner." One camera angle shows the view from the cashier counter that looks out the front windows and doors of the store; the other camera angle shows the view from the cashier counter that looks out over the interior of the store.

Sometime later, Caraway received a call from the dispatcher at Groendyke. Caraway stayed on the phone with her while he went to look for the driver of the tanker truck. Caraway saw that the passenger door was open and that feet were sticking out. Caraway yelled at the driver, grabbed his leg, and shook him but received no response. After concluding the call with the Groendyke dispatcher, Caraway called 911.

## C. The Encounter and the Detention in Benbrook

Sergeant Richard Cooper with the Benbrook Police Department testified that around 3:30 a.m. on May 7, he was sitting in his marked patrol car in the parking lot of a strip center located at 999 Winscott. Around that time, he saw the owners of the doughnut shop enter the parking lot. Shortly after the doughnut shop owners pulled into the parking lot, Sergeant Cooper saw a white Ford Mustang enter the parking lot and park in one of the first parking spaces. After a few seconds, the Mustang backed out, moved down several spaces, and parked again. After a few seconds in that second parking spot, the Mustang pulled out, drove around a little cement island, and parked—with its left wheels on top of the cement island such that it had "a pretty dramatic lean to it"—beside the doughnut shop owners' vehicle. Sergeant Cooper testified that the Mustang driver's behavior was not typical for that time of night because there was only one other vehicle in the parking lot and yet the driver of the Mustang chose to park in three different parking spots and failed to demonstrate his ability to control his vehicle when he drove up on the cement island.

5

Sergeant Cooper drove his patrol unit around to the front of the doughnut shop, exited his vehicle, and spoke with the doughnut shop owners to find out if they knew the driver or recognized the Mustang.[3] Afterwards, Sergeant Cooper went to speak to the driver of the Mustang.

Sergeant Cooper approached the Mustang on foot and noted that there was no one else in the car but the driver. Sergeant Cooper asked the driver for identification, and the driver—Adams—presented his driver's license. While obtaining Adams's identification, Sergeant Cooper noticed an open container of what he believed to be alcohol in the center console. Sergeant Cooper also noted that Adams's responses were slow and soft. Suspecting that Adams might be intoxicated, Sergeant Cooper called for backup and asked Adams to step out of his vehicle so that Sergeant Cooper could conduct a sobriety test. Adams cooperated and exited his vehicle.

In response to Sergeant Cooper's request for backup, Officer Denson arrived on the scene. Prior to Sergeant Cooper's performing the horizontal gaze nystagmus (HGN) test on Adams, Officer Denson noticed that Adams had a bulge in the front of his waistband area and asked him about it. Adams responded that it was a nine-millimeter handgun. Officer Denson removed the weapon, which had a cartridge in

---

[3]During the trial, Sergeant Cooper was not asked what the doughnut shop owners' response was; at the suppression hearing, Sergeant Cooper testified that they responded that they did not know the driver of the Mustang and that he was following them.

6

the chamber; placed the weapon in the front of Sergeant Cooper's vehicle; and then handcuffed Adams. Adams passed the HGN test.

Based on the open container of alcohol and answers to specific questions that Sergeant Cooper asked Adams after the gun was found, Sergeant Cooper searched the Mustang and found a little plastic bag in the center console that contained a small amount of a green leafy substance that he recognized as marijuana. The center console also contained a Colt Mustang .380 semi-automatic. On the passenger floorboard, Sergeant Cooper found a prescription bottle that also contained a small amount of a green leafy substance that he believed to be marijuana. Sergeant Cooper confiscated the marijuana, and the officers called for a drug dog.

At an unidentified point during the encounter, Sergeant Cooper contacted dispatch to run a warrant search; no warrants were found. Sergeant Cooper wrote down the serial numbers of the .380 semi-automatic and the Glock nine-millimeter handgun, which had the serial number AAGY514; ran a check to see if the guns had been reported as stolen; confirmed that Adams did not have a concealed handgun license; and then placed the guns in the trunk of the Mustang. Sergeant Cooper issued Adams a citation for possession of drug paraphernalia and a warning for criminal trespass for being at the doughnut shop. Sergeant Cooper released Adams, who left the parking lot in his Mustang.

## D. The Murder Investigation at the Crime Scene

Officer Leticia Myers with the Fort Worth Police Department (FWPD) testified that she was dispatched back to the QuikTrip where she had fueled up earlier that same day.[4] She arrived at 4:06 a.m. and saw that the tanker truck was still parked in the same location and that the hoses were still connected. She spoke to the store clerk and then went to the cab of the tanker truck. The passenger door was open, and she saw the legs of a man. Officer Myers said something to him and grabbed his foot to shake him to see if he would wake up. When she received no response, she pulled herself into the cab of the tanker truck and noticed that the driver's face was covered in dried blood and that there were bullet holes in the windshield. Officer Myers testified that it appeared that the driver had been shot in the head.

Detective Ernie Pate with FWPD testified that he arrived on the scene around 5:30 a.m. Detective Pate noted that there was a tanker truck parked at the QuikTrip and that in the cab of the tanker, there were bullet holes and a deceased person who had a gunshot wound. Detective Pate requested that a crime scene officer, a detective from the digital forensics unit, and his partner Detective Cedillo come to the scene. Detective Pate spoke with representatives from the trucking company and the store clerk.

---

[4]Officer Myers testified that she had fueled up her patrol car at the QuikTrip on Bryant Irvin Road around 1:50 a.m. on May 7, while the tanker truck was there. She saw several lights that were illuminated underneath the truck and "everything connected to the ground pumps," but she did not get close to the tanker truck. She did not know at that time that the driver of the tanker truck had been shot.

Detective Cedillo testified that he arrived on the scene at 5:55 a.m. in response to a call from Detective Pate and noted five or six gunshot holes through the cab of the tanker and two gunshot holes through the windshield. The detectives watched the surveillance footage from the QuikTrip.

The surveillance video showed Luevano walking into the store at 1:28 a.m. to log in the load of fuel on the computer and exiting the store at 1:32:41 a.m. Two customers who were in the store when Luevano entered had exited at 1:32:02 a.m., leaving no other customers in the store and leaving only one parked vehicle (presumably Caraway's) visible in front of the store. The video showed Adams walking into the store at 1:37 a.m., putting some items on the counter, and leaving the store emptyhanded. At 1:39:10 a.m., a car drove by the front of the store, circled around through the gas pumps, came back to the front of the store, and then went off camera at 1:39:55 a.m. At 1:39:58 a.m., the video has the sound of one gunshot followed quickly by five more gunshots, which correlated with the six bullet holes found in the cab of the tanker.

Based on the surveillance footage, the detectives identified a white Ford Mustang with a spoiler on the trunk and a black stripe along the bottom passenger-side of the vehicle as a vehicle that might have been involved in the offense. The

9

license plate was not discernable from the surveillance footage, but that information was later provided to the FWPD by the Benbrook PD.[5]

### E. The Stop for Speeding in Palo Pinto County

Trooper Burt Blue with the Texas Department of Public Safety testified that on May 7 around 7:27 a.m., he was approximately thirty-five to forty miles from Fort Worth on Interstate 20 in Palo Pinto County when he spotted and stopped a white vehicle that was traveling at a high rate of speed. When Trooper Blue approached the white Mustang, he smelled marijuana on the passenger side. The dash cam video from the traffic stop was played for the jury, reflecting that Adams was the sole occupant of the Mustang. Trooper Blue asked Adams why he was driving so fast, and he gave three different explanations. Trooper Blue testified that Adams's answers did not explain his excessive speed. When Trooper Blue asked Adams where he was going, he responded that he was going to California "to start over." Based on his interactions with Adams during the stop, Trooper Blue believed that there was something wrong with Adams and that he was hiding something. During the search of the Mustang, Trooper Blue found two guns in the trunk and wrote down the serial numbers. When Trooper Blue ran a warrant check on the guns, he discovered that

---

[5]Based on the record, it appears that the FWPD alerted the media to the murder but did not release information about the vehicle. When Benbrook PD heard about the murder at the QuikTrip on Bryant Irvin, a detective alerted the FWPD about the detention of Adams on Winscott Road because the locations were relatively close in proximity.

they were not registered to anyone and that they were not stolen. Trooper Blue issued a citation to Adams for traveling 118 miles per hour in a seventy-five mile-per-hour zone.

### F. The Encounter at the 7-11 in Fort Worth

Around 11:05 a.m., Detective Cedillo returned to the QuikTrip to put air in the tires of his unmarked vehicle and noted that the crime scene had already been processed and that the tanker truck had been removed. When Detective Cedillo exited the QuikTrip, he saw a white Ford Mustang with a spoiler and a black racing stripe that was stopped at the light. Detective Cedillo looked through his notepad to obtain the license plate number that the Benbrook PD had provided, and he confirmed that the license plate on the Mustang matched the information from the Benbrook PD. Detective Cedillo followed the Mustang and noticed that the driver was not utilizing his turn signals for lane changes. Detective Cedillo radioed for a marked patrol unit to assist with a traffic stop. Before the marked unit arrived, the driver of the Mustang turned into a 7-11 gas station on South Hulen and pulled up to the gas pumps. When the patrol unit arrived, they confirmed that the driver was Adams and shared that information with Detective Cedillo.

Detective Cedillo then introduced himself to Adams and told him that the FWPD was conducting an investigation and that they would like to speak with him. Detective Cedillo asked Adams if he would be willing to come downtown to the police station, and Adams agreed. Detective Cedillo told Adams that he was not

under arrest, that he would be driven back to the 7-11, and that he was not going to be arrested. Adams rode without handcuffs in the front seat of Detective Cedillo's unmarked car. Adams's Mustang was locked, and one of the patrol officers stayed at the 7-11 with the Mustang, which was seized later that day and taken to the FWPD auto pound.

### G. Evidence Collected from Adams at the Police Station

Once at the police station, Detective Cedillo took Adams to Detective Pate's office. Detective Pate was concerned that Adams might have GSR on his body or on his clothes. Because GSR can be "easily lost, destroyed, [or] damaged," Detective Pate instructed a crime scene officer to swab Adams's face and hands and to collect the clothes and shoes that he was wearing. After that evidence was collected, Adams was driven back to his location of choice by another detective.

### H. The Autopsy

Dr. Richard Christian Fries, the deputy medical examiner with the Tarrant County Medical Examiner's Office who conducted the autopsy, testified that Luevano had a fatal gunshot wound to the right side of his face and that there was no exit wound. Dr. Fries recovered the bullet and the fragments of the bullet that had broken off and had lodged in Luevano's cervical spine. Dr. Fries testified that there was no evidence of close-range fire. Dr. Fries concluded that the cause of Luevano's death was a gunshot wound to the head and neck and that the manner of his death was homicide.

## I. The Searches

A search warrant was obtained for Adams's Mustang, and Laurie Scheiern, who was previously a FWPD crime scene officer but had retired by the time of the trial, performed the search. In the front seat of the vehicle, Scheiern found two citations—one for possession of drug paraphernalia from Benbrook and one for speeding in Palo Pinto County, an ATM receipt from Azle with a time stamp of 10:05[6] on May 7, and a backpack with a piece of a .45-caliber casing in it. In the console, Scheiern found two single cartridges (one was a Winchester .380 auto cartridge, and the other was a Federal .45 auto cartridge) and an ammunition magazine with five cartridges in it. In the back seat, Scheiern found two empty nine-millimeter cartridge casings. In the trunk, Scheiern found a cooler that was loaded with weapons and ammunition. The weapons in the cooler included a Glock nine-millimeter semi-automatic pistol with a serial number of AAGY514 and a Colt .380 semi-automatic pistol. The ammunition included a Glock nine-millimeter fully-loaded magazine, a .45-caliber ammunition magazine, a Glock magazine with nine cartridges, and some loose cartridges—one of which was a cartridge casing head stamped with FC nine-millimeter Luger. Using individual sticky tabs, Scheiern collected trace evidence from various places on the interior of the Mustang so that it could be tested for GSR.

---

[6]Although the receipt does not specify whether the time was 10:05 a.m. or 10:05 p.m., we presume that it was 10:05 a.m. because the Mustang was seized, impounded, and searched on May 7.

13

Other crime scene officers combed through the tanker truck and removed two of the projectiles that were embedded in the cab and extracted a copper jacket that had separated from the main part of a bullet.

## J. Results of the Ballistics Testing

Michael Ward, formerly a supervisor of the firearm and tool mark unit of the FWPD, testified that he tested a firearm and ammunition related to this case. The firearm that he test-fired was a Glock nine-millimeter semi-automatic pistol with the serial number AAGY514. Ward compared the casings from the test-firing to the three casings found in Adams's Mustang; two casings were found in the backseat, and one casing was found in the cooler in the trunk. Based on a microscopic comparison of the known casing from test-firing the Glock to the casings found in Adams's Mustang, Ward opined that the three cartridge casings found in Adams's Mustang had been fired from the Glock firearm. Ward compared the projectile recovered from Luevano's body during the autopsy with the projectiles fired from the Glock firearm and determined that the projectile recovered from Luevano's body was fired from the Glock firearm. Ward also determined that the projectile recovered from the dashboard of the tanker truck, the projectile recovered from the driver's door of the tanker truck, and the bullet fragments that were removed from the tanker truck were fired from the Glock firearm. Ward testified that he had no doubt in his mind regarding the conclusions he reached.

14

### K. Results of the GSR Testing

Anne Koettel, a trace evidence examiner at the Tarrant County Medical Examiner's Office, testified that she analyzed the GSR kit collected from Adams and confirmed one particle of GSR on the stub collected from his mouth. Koettel testified that twenty particles of GSR were collected from the Mustang: one particle was on the stub collected from the headrest of the front seat, five particles were on the stub collected from the dash above the glove box, four particles were on the stub from the headliner above the front passenger seat, five particles were on the stub collected from the top window ledge of the right front door, and five particles were on the stub collected from the right door armrest.[7] Koettel collected sample stubs from the gray t-shirt and jeans that had been seized from Adams.[8] Koettel testified that there were no GSR particles detected on the four stubs collected from the t-shirt and that there was one particle that was characteristic of primer GSR on the stub collected from the left thigh of the jeans. Koettel explained that the presence of GSR particles indicates that the person fired a firearm, was in the proximity of a firearm when it was fired, or has handled a firearm or some other object that had GSR on it.

---

[7]Koettel testified that in addition to those particles that were confirmed, there were additional particles present on the stubs from the door window ledge and the door armrest but that their laboratory's policy is to confirm up to five particles on a stub "and then just refer to additional particles detected."

[8]On May 15, Detective Pate obtained a search warrant to have GSR testing performed on the clothes that were collected from Adams on May 7.

### III.  Sufficient Evidence Supports the Conviction

In his first issue, Adams challenges the sufficiency of the evidence to support his conviction.  Specifically, Adams argues that there is no evidence placing the gun in his hand and proving that he shot and killed Luevano.

### A.  Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged.  *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV.  In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).  This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility.  *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622.  Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's.  *Queeman*, 520 S.W.3d at 622.  Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the

16

verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49. Moreover, the standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

## B. The Law on Murder

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1)–(2).

## C. Analysis

Here, Adams does not challenge that Luevano's death resulted from being shot with a firearm, nor does he challenge that he (Adams) was at the QuikTrip on the night in question. Adams instead argues that the State did not prove beyond a reasonable doubt that he was alone in his Mustang at the QuikTrip and that he was the one who pulled the trigger. Adams acknowledges that "[t]here was a large amount

17

of purely circumstantial evidence" in this case and appears to imply that circumstantial evidence cannot support his conviction.

But as set forth above, circumstantial evidence is as probative as direct evidence in establishing guilt. *See Jenkins*, 493 S.W.3d at 599. The circumstantial evidence in this case, which is set forth in detail above, shows the following:

- Adams exited the QuikTrip a couple of minutes before a white Mustang drove by the front of the store.

- Three seconds after the white Mustang passed out of the view of the cameras inside the QuikTrip store, the first gunshot is heard and is quickly followed by five other gunshots. The white Mustang was the only vehicle in the vicinity of the tanker truck, and six bullets penetrated the cab of the tanker truck.

- Approximately two hours later, the Benbrook PD encountered Adams, who was driving a white Mustang matching the one seen at the QuikTrip and had a Glock nine-millimeter handgun (with serial number AAGY514) tucked into his waistband.

- Ballistics testing revealed that the projectile recovered from Luevano's body, as well as the projectiles recovered from the tanker truck and the cartridge casings recovered from inside the Mustang, had been fired from the Glock nine-millimeter handgun with serial number AAGY514 that the Benbrook PD had seen tucked into Adams's waistband.

- GSR was found on Adams's mouth, the thigh portion of his jeans, and throughout the interior of the Mustang.

- Each of the three times that law enforcement encountered Adams on May 7, he was the sole occupant of the Mustang.

- Adams fled the scene, and when he was stopped six hours later for traveling 118 miles per hour in a seventy-five mile-per-hour zone, he told the trooper that he was headed to California "to start over."[9]

The evidence places Adams in the store within feet of the murder within seconds of the sounds of gunshots of the same number as the bullets that penetrated Luevano's tanker truck cab. Only one vehicle is seen in the same time and space as the sounds of these shots—a Mustang with the same unique characteristics as the one that Adams drove. The interior of the Mustang that Adams drove contains evidence that a firearm was discharged within it. The firearm used to murder Luevano is found on Adams's person shortly after the event. Evidence is found on Adams that he was in proximity to the discharge of a firearm, and that evidence is of a nature that it does not linger long. The interior of the Mustang contains not just signs of the discharge of a firearm but evidence that the murder weapon in Adams's possession was discharged within it, in the form of spent shell casings fired from that weapon.

---

[9] *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) ("We have recognized that a factfinder may draw an inference of guilt from the circumstance of flight.").

Thus, the evidence establishes what is probably more than a reasonable inference that the weapon causing Luevano's death was in the same confined space as Adams at the time that weapon was used to cause Luevano's death. And Adams's possession of that weapon shortly after its use to kill Luevano creates a reasonable inference that Adams had possession of the weapon when it was used to commit that murder, especially in view of the implausibility of the explanation that the jury would have to accept to undermine that inference: Adams, having seen the weapon used by someone else to murder Luevano, not only took possession of it but also placed it on his person.

While each circumstance of guilt considered in isolation is insufficient to prove that Adams was the shooter, when all of the evidence is viewed in the light most favorable to the verdict and when the cumulative force of all the admitted evidence and reasonable inferences that can be drawn therefrom are considered, we conclude that the evidence is sufficient to show that Adams was the shooter. *See Ingerson v. State*, 559 S.W.3d 501, 511 (Tex. Crim. App. 2018) (holding circumstantial evidence sufficient to identify appellant as the shooter); *Clayton*, 235 S.W.3d at 779–82 (holding that a rational juror could find beyond a reasonable doubt that appellant was responsible for killing victim based on reasonable inferences from and the cumulative force of the incriminating circumstantial evidence presented). Accordingly, we hold that the evidence is sufficient to support Adams's conviction for murder. *See Clayton*, 235 S.W.3d at 782. We overrule Adams's first issue.

## IV.  The Trial Court Properly Denied the Motion to Suppress

In his second issue, Adams argues that the trial court erred by denying his motion to suppress evidence seized without a warrant because there was no probable cause.  Specifically, Adams contends that he did nothing illegal to cause Sergeant Cooper to approach him in the parking lot of the strip center on Winscott Road.

### A.  Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court's decision, we do not engage in our own factual review.  *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony.  *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007).  Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor.  *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).  But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions

de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

## B. The Law on the Various Types of Police-Citizen Interactions

The law categorizes police-citizen interactions into three types: (1) consensual encounters that do not implicate the Fourth Amendment, which citizens are free to

terminate at any time; (2) investigative detentions, which are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, which are the most intrusive of Fourth Amendment seizures and require probable cause. *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011).

What follows here is the ambiguity of whether the encounter was in category (1) or category (2). Because Adams does not argue that Sergeant Cooper arrested him, we limit our analysis to the first two types of police-citizen interactions. We review de novo whether a police-citizen contact was a consensual encounter or an investigative detention and at what point the former became the latter. *Furr*, 499 S.W.3d at 877. No bright-line rule exists; instead, we must examine the totality of the circumstances surrounding the contact to determine whether a reasonable person would have felt free to ignore the officer's request or to terminate the contact. *Id.* This test is objective and does not rely on the contacted person's or the police officer's subjective belief. *Id.* at 878. Nor does this test take into account whether the officer communicated that the citizen was free to terminate the encounter. *Woodard*, 341 S.W.3d at 411.

### 1. Consensual Encounters

Law enforcement officers may, without probable cause or reasonable suspicion, approach individuals to request identification and information. *See State v. Castleberry*,

332 S.W.3d 460, 466 (Tex. Crim. App. 2011). Such encounters do not require any justification on the officers' part. *See United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 1876 (1980); *Woodard*, 341 S.W.3d at 411; *State v. Larue*, 28 S.W.3d 549, 553 (Tex. Crim. App. 2000). A police officer is as free as any other citizen to approach citizens on the street and ask for information. *Woodard*, 341 S.W.3d at 411; *Garcia-Cantu*, 253 S.W.3d at 243. Such interactions may involve inconvenience or embarrassment, but they do not involve official coercion. *Garcia-Cantu*, 253 S.W.3d at 243. Only when the implication arises that an officer's authority cannot be ignored, avoided, or ended does a Fourth Amendment seizure occur. *Woodard*, 341 S.W.3d at 411; *Garcia-Cantu*, 253 S.W.3d at 243.

Circumstances indicating that a police-citizen interaction is a seizure, rather than a consensual encounter, include the threatening presence of several officers, the officer's display of a weapon, physical touching of the citizen by the officer, the officer's words or tone of voice indicating that compliance with the officer's requests might be compelled, flashing lights, or the blocking of a suspect's vehicle. *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877; *Garcia-Cantu*, 253 S.W.3d at 243. But absent this type of evidence, otherwise inoffensive conduct between a citizen and a police officer cannot, as a matter of law, amount to a seizure of that person. *Mendenhall*, 446 U.S. at 555, 100 S. Ct. at 1877; *Woodard*, 341 S.W.3d at 413.

## 2. Investigative Detentions

A detention may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop. *Id.*

A police officer may lawfully stop a vehicle if he has a reasonable basis for suspecting the motorist has committed a traffic violation. *Garcia v. State*, 827 S.W.2d 937, 944–45 (Tex. Crim. App. 1992). A routine traffic stop is a detention. *See Simpson v. State*, 29 S.W.3d 324, 327 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). An officer conducting a traffic stop has the right to ask for a driver's license and insurance papers and identification, to run a computer check on the information provided, and to check for outstanding warrants. *Rodriguez v. United States*, 135 S. Ct. 1609, 1611 (2015); *see also Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004).

## C. The Suppression Hearing[10]

Immediately prior to the start of the trial, the trial court held a hearing on Adams's motion to suppress. Adams's counsel summarized his arguments as challenging the "illegal stop, detention, search, and the things that [Sergeant Cooper of the Benbrook PD] took, [because the FWPD] used that information in two different search warrants, one for the search of the vehicle and one for the search of [Adams] as well as the arrest of [Adams]." The State then proceeded to call Sergeant Cooper, who made the initial stop.

Sergeant Cooper testified that around 3:30 a.m. on May 7, 2015, he was in the parking lot of a strip mall on Winscott Road. While monitoring traffic and reviewing paperwork, Sergeant Cooper saw the owners of the doughnut shop, which was located in the strip mall, pull into the parking lot. Shortly thereafter, Sergeant Cooper noticed a white Ford Mustang pull into the parking lot. The driver of the vehicle parked briefly in a parking spot near some mailboxes. He then backed out, moved

---

[10]During the trial, the prosecutor asked Sergeant Cooper what occurred when he made contact with Adams in the parking lot. Adams reurged his objections from the suppression hearing, which the trial court overruled. The trial court did, however, grant Adams a running objection on Sergeant Cooper's testimony "in regards to all contact." We conclude that Adams fully participated in the relitigation of the issue during the trial; therefore, we will consider the evidence adduced at both the suppression hearing and the trial on the merits. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). Because the testimony at the suppression hearing regarding Sergeant Cooper's interactions with Adams and regarding the seizure of evidence was more detailed, we set it forth here but will consider both the trial testimony and the suppression hearing testimony in conducting our analysis.

down a few spaces, and parked again for a few seconds before backing out of that space, pulling around to where the doughnut shop owners had parked, and parking a third time—this time with his left wheel parked on top of a cement island. Sergeant Cooper drove around to where the doughnut shop owners were and asked them if they recognized the Ford Mustang or if they knew the driver; they did not. The doughnut shop owners said that the Ford Mustang had been following them. Sergeant Cooper testified that there were no other vehicles in the parking lot and that none of the businesses in the strip mall were open. Sergeant Cooper testified that he was concerned about the driver of the Ford Mustang "[b]ased upon the driving behavior, parking multiple times, driving up on the curb, . . . [a]nd then the welfare of the doughnut shop people" and that he had reason to believe that the driver was possibly intoxicated.

Based on his concerns, Sergeant Cooper walked up to the Ford Mustang, which was already stationary,[11] and made contact with the sole occupant of the vehicle.[12] Sergeant Cooper asked the driver for identification,[13] and the driver provided his driver's license, revealing that he was Adams. While speaking with Adams, Sergeant

---

[11]Sergeant Cooper testified that he did not activate any traffic lights, sirens, or horns to cause the Mustang to stay stationary.

[12]When asked whether he was effecting a traffic stop, Sergeant Cooper replied, "Not necessarily. I was just making contact with the occupant of that vehicle."

[13]Sergeant Cooper testified that this is standard procedure when having an encounter with a citizen.

27

Cooper noted that Adams's speech "was really soft and low," and he saw an open container of alcohol in the center console and asked Adams about it. Adams said that he had consumed it earlier and that there was nothing in it; he handed the can to Sergeant Cooper, who verified that only a minute amount of liquid remained in the bottom of the can.

Sergeant Cooper decided to perform field sobriety tests on Adams and called for a backup officer—Officer Denson—who arrived on the scene quickly. During the HGN test—the sole test that was performed—Officer Denson noticed a bulge near the front of Adams's waistband. Officer Denson asked Adams about the bulge, and Adams replied that it was a nine-millimeter handgun. Sergeant Cooper testified that it was illegal for Adams to be outside his vehicle with a concealed weapon and that it posed a risk to officer safety. Sergeant Cooper therefore placed Adams in handcuffs, and Officer Denson retrieved the gun.[14] When Sergeant Cooper finished the HGN test, he concluded that Adams was not impaired.

Sergeant Cooper then searched Adams's vehicle based on his observation of the open container of alcohol in the vehicle and on Adams's response—to the question of whether there were other weapons or illegal items in the vehicle—that there was marijuana in the center console. During a cursory search of the vehicle, Sergeant Cooper found a pill bottle with a very small quantity of marijuana, a Colt

---

[14]The use of handcuffs does not automatically convert a temporary detention into an arrest. *State v. Sheppard*, 271 S.W.3d 281, 289 (Tex. Crim. App. 2008).

.380 semi-automatic pistol, and a little Ziplock bag that had a very small amount of a green leafy substance that Sergeant Cooper believed to be marijuana. After the initial search was performed, a drug dog was brought to the scene. Sergeant Cooper ultimately issued Adams a citation for possession of drug paraphernalia and for criminal trespass.[15]

Sergeant Cooper testified that the stop lasted approximately forty-five minutes to an hour and that the duration contributed to his forgetting that he had Adams's driver's license in his possession. Sergeant Cooper testified that because he inadvertently did not return Adams's driver's license to him at the end of the stop, he logged it into the property room. Sergeant Cooper did return Adams's Glock nine-millimeter handgun to him by placing it in the trunk of his vehicle, along with the .380 Colt Mustang that was also found in the car.

On cross-examination, Sergeant Cooper testified that Adams was not doing anything illegal by being in the parking lot or by moving to different parking spots. Sergeant Cooper said that he made contact with Adams, "Basically to find out what he's doing. I mean, it rose my curiosity." Sergeant Cooper explained that he gave Adams a citation for criminal trespass because the doughnut shop owners did not want him inside their shop and "were fearful for his activities that morning."

---

[15]During the trial, Sergeant Cooper testified that the citation contained Adams's identifying information—his name, date of birth, height, weight, address, and place of employment, his driver's license information, and a description of his vehicle.

Detective Cedillo, who assisted Detective Pate in the investigation of the homicide that took place at QuikTrip, testified that at the beginning of their investigation, they received information from the Benbrook PD regarding contact with a white Mustang driven by Adams because "he appeared to be in a suspicious place at a suspicious time." The Benbrook PD informed the FWPD that the driver had weapons in his vehicle, that a citation was issued, and that the weapons were left in the vehicle.

Detective Cedillo said that during the morning hours of May 7 and after his initial response to the offense, he spotted a white Mustang with a black stripe and a spoiler near the QuikTrip where the offense had occurred. Detective Cedillo confirmed that the license plate of the Mustang he saw matched the one provided by the Benbrook PD and began following it. As Detective Cedillo followed the Mustang, he witnessed the driver commit several traffic offenses. Because Detective Cedillo was in an unmarked vehicle, he contacted dispatch to request a marked unit to assist with a traffic stop. But before the backup officers arrived, the Mustang pulled into a 7-11 and stopped at the gas pumps.

When the backup officers arrived, they approached the driver of the Mustang, and Detective Cedillo walked up to talk to the driver shortly thereafter. After Detective Cedillo confirmed that the driver was Adams, Detective Cedillo identified himself as a detective; asked Adams if he had any weapons on his person, to which he responded that he did not; and asked if he had any weapons in his vehicle, to which

he responded that he did. Detective Cedillo told Adams that they were going to leave the weapons in his vehicle and that he wanted Adams to come downtown to speak with the police about an investigation. Adams voluntarily agreed to go downtown to speak with the police. Detective Cedillo stated that the Mustang was then locked and that an officer stayed at the 7-11 with the Mustang "until we decided what we were going to do" with it.

Detective Cedillo testified that Adams rode with him downtown to the police station; Adams sat in the front seat and was not handcuffed. Once at the police station, Adams was told that he was not under arrest and that he was free to leave. Nevertheless, Adams proceeded to chat with Detective Cedillo and Detective Pate, whom Detective Cedillo had contacted en route to the police station.

Detective Pate testified that due to the homicide at the QuikTrip on Bryant Irvin Road and after receiving information from the Benbrook PD, Adams was asked to come to the police station. Adams agreed. Detective Pate testified that Adams was not under arrest.

Based on his conversation with Adams, Detective Pate concluded that Adams might have GSR on him. Detective Pate explained that trace evidence, such as GSR, is easily destroyed. Detective Pate did not obtain a warrant to obtain GSR from Adams's hands due to the exigency. Detective Pate testified that "there was nothing preventing [Adams] from possibly destroying or manipulating that evidence that could

31

have been on him at the time."[16] Another detective collected the GSR stubs that tested for GSR on Adams's face and hands.

Detective Pate also seized Adams's clothing under exigent circumstances because Detective Pate believed that the clothing could possibly have GSR on it and did not want that evidence destroyed or tampered with in any way. Detective Pate explained that he seized Adams's clothing under the exigent circumstances warrant exception because Adams was allowed to leave and could destroy any possible evidence on his clothes by washing them. Adams was provided with an orange jumpsuit.

Detective Pate participated in the decision to impound Adams's car. Detective Pate explained that Adams's car was impounded because it could have evidence in it and because it could be easily moved.

Detective Pate testified that during the time that the police were obtaining the GSR swabs from Adams's face and hands and seizing his clothing, he was detained and was not free to leave. After Adams's clothing and the GSR swabs from his body

[16]Detective Pate later explained that at the time when he met with Adams, he knew the following: that the victim had died from a gunshot wound that possibly came from a handgun; that Adams had admitted to having handguns with him that night; that the surveillance video from QuikTrip showed a white Mustang with a black racing stripe and a spoiler, which was the type of vehicle that Adams was driving; and that during an encounter with a Benbook police officer several hours earlier, Adams was in possession of a Glock nine-millimeter and a .380 Colt Mustang. All of that information contributed to Detective Pate's concern that there might be GSR evidence on Adams's person and on his clothing and that he needed to make sure that the evidence was not lost.

32

were obtained, a detective drove him to the location where he requested to be dropped off.

No other witnesses testified. The trial court denied Adams's motion to suppress.

## D. Analysis

Adams argues on appeal that all the evidence seized by the police—particularly his clothes and the GSR from his body—was fruit of the poisonous tree because he had done nothing illegal to cause Sergeant Cooper of the Benbrook PD to approach him in the parking lot at Winscott Road and because the FWPD did not obtain a warrant before obtaining his clothes and the GSR from his body. We initially address the legality of Sergeant Cooper's interaction with Adams and then proceed to address the legality of the seized items.

### 1. Sergeant Cooper's Initial Interaction with Adams Was a Consensual Encounter

Adams's argument, which implies that Sergeant Cooper was required to witness an illegal act before approaching Adams in the parking lot, misconstrues the facts and the law. As set forth above, a consensual encounter does not require any justification on the officer's part. *See Mendenhall*, 446 U.S. at 553, 100 S. Ct. at 1876; *Larue*, 28 S.W.3d at 553. Sergeant Cooper's walking up to Adams's parked car and requesting his identification was a consensual encounter, not a seizure, because Sergeant Cooper was the only officer present and because there is no evidence that he displayed a

weapon, physically touched Adams, used a tone of voice indicating that compliance with his request for identification might be compelled, activated his patrol car's flashing lights, or used his patrol car to block in Adams's vehicle. Viewing the totality of the evidence in the light most favorable to the trial court's ruling, we conclude that Sergeant Cooper's actions do not constitute such a show of authority as to indicate to a reasonable person that he would not be free to terminate the encounter. Thus, up to the point when Sergeant Cooper saw the open container of alcohol, his actions were justified as a consensual encounter. *See Gilbert v. State*, Nos. 07-16-00158-CR, 07-16-00159-CR, 2016 WL 7010570, at *3 (Tex. App.—Amarillo Nov. 22, 2016, pet. ref'd) (mem. op., not designated for publication) (holding, under the totality of the circumstances, that a consensual encounter occurred when officer approached car parked in church parking lot near midnight and asked if anything was wrong and if he could see identification from the occupants).

### 2. Visible Open Container of Alcohol and Soft, Slow Speech Provided Reasonable Suspicion for an Investigative Detention

While speaking with Adams, Sergeant Cooper saw an open container of alcohol in the center console and noted that Adams's speech was really soft and slow. At that point, the consensual encounter became an investigative detention based upon reasonable suspicion that Adams had been driving while intoxicated. *See State v. Priddy*, 321 S.W.3d 82, 88 (Tex. App.—Fort Worth 2010, pet. ref'd). Thus, Sergeant

34

Cooper was authorized to detain Adams for the purpose of investigating whether he had been driving while intoxicated.[17] *See id.*

### 3. The Alleged Seizure of Various Items by the Benbrook PD

Adams contends in his brief that "all of the evidence seized was done so illegally even though [he] was released by Benbrook police" and identifies the illegally-seized evidence as his name, the vehicle identification number of his car, and his license plate number. With regard to Adams's name, Sergeant Cooper did not need probable cause or even reasonable suspicion to ask for identification and thus was permitted to obtain Adams's name during the consensual encounter.[18] *See Castleberry*, 332 S.W.3d at 466. With regard to Adams's vehicle identification number and license plate number, the record does not state when Sergeant Cooper obtained this information. Because we must view the evidence in the light most favorable to the trial court's ruling on the motion to suppress, we presume that the trial court found that Sergeant Cooper obtained that information during the investigative detention. As

---

[17]To the extent that Adams attempts to raise challenges in his brief related to the second and third traffic stops, we hold that he forfeited those arguments by specifically waiving any challenges to those stops at the suppression hearing. *See Foster v. State*, 874 S.W.2d 286, 289 (Tex. App.—Fort Worth 1994, pet. ref'd) (holding that appellant's arguments on appeal, which were different than those raised at the suppression hearing, were waived).

[18]To the extent that Adams's argument on appeal encompasses a challenge to the alleged seizure of his driver's license, the record demonstrates that any seizure of his driver's license was inadvertent. Sergeant Cooper testified that he forgot to return Adams's driver's license. Moreover, that information was contained on the citation that was issued for possession of drug paraphernalia.

set forth in the analysis above, Sergeant Cooper searched Adams's car based on his observation of an open container of alcohol in the console and Adams's response—to the question of whether there were other weapons or illegal items in the vehicle—that there was marijuana in the center console. After the search revealed drug paraphernalia, Sergeant Cooper issued Adams a citation. Because the citation required identifying information about Adams's vehicle, Sergeant Cooper did not improperly seize Adams's vehicle identification number and license plate number as part of the investigative detention. *See Rodriguez*, 135 S. Ct. at 1611; *see also Kothe*, 152 S.W.3d at 63. With regard to the small amount of marijuana that was seized,[19] Sergeant Cooper was justified in seizing the marijuana after Adams admitted that it was in the car. *See Doyle v. State*, 779 S.W.2d 492, 495 (Tex. App.—Houston [1st Dist.] 1989, no pet.) (holding that appellant's admission that she had some marijuana roaches in a bag on the front floorboard of the car justified the seizure of the marijuana).

### 4. The Seizure of Adams's Clothes and the Seizure of GSR on His Body

Adams argues that the trial court should have granted his motion to suppress on the ground that the FWPD detectives took his clothes and swabbed his hands and

---

[19]Because Adams's brief challenges "all of the evidence seized" by the Benbrook PD, we address the seizure of the marijuana even though Adams's brief does not specifically challenge this seizure. *See* Tex. R. App. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

face without a warrant. Adams sets forth several pages of law on Fourth Amendment searches and seizures followed by a one-sentence analysis:

> When the facts of this complex series of searches and seizures [are reviewed], Appellant believes that the court will find that there was no probable cause to stop and search Appellant and that there were no exigent circumstances to justify the taking of [GSR] from Appellant's body and his clothes and that the evidence must be excluded.

The thrust of Adams's argument on appeal is that because the evidence identifying him and his vehicle was allegedly illegally seized by the Benbrook PD and then passed along to the FWPD, the evidence that the FWPD seized was also illegally seized. But as set forth above, we have concluded that the identifying evidence was not illegally seized by Sergeant Cooper. Moreover, the record demonstrates that exigent circumstances necessitated the seizure of Adams's clothing[20] and GSR from his hands because trace evidence, like GSR, could be easily destroyed by Adams's washing his hands and face or his clothes. *Cf. Johnson v. State*, No. 04-13-00766-CR, 2014 WL 7339506, at *3 (Tex. App.—San Antonio Dec. 23, 2014, no pet.) (mem. op., not designated for publication) (upholding trial court's denial of motion to suppress GSR results when appellant's hands and fingers were swabbed for GSR because it was beginning to rain and any GSR could have been washed off).

---

[20]To the extent that Adams's issue challenges the GSR testing that was performed on his clothing, the record discloses that the State obtained a search warrant pertaining to that testing. Adams does not raise a challenge to the validity of that warrant.

### 5.  Denial of Suppression Motion Was Proper

Having determined that Sergeant Cooper's initial interaction with Adams was a consensual encounter, that Sergeant Cooper's detention of Adams following the consensual encounter was supported by reasonable suspicion, and that none of the complained-of items were illegally seized, we hold that the trial court did not err by denying Adams's motion to suppress.  Accordingly, we overrule Adams's second issue.

## V.  Conclusion

Having overruled Adams's two issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  March 7, 2019